IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>CLIFFORD WARREN PERRY,<br><br>Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:04-CR-178 TC |

Defendant Clifford Warren Perry has been indicted on one count of knowing possession of a firearm by a convicted felon, and aiding and abetting co-defendants in the same, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 2.  Mr. Perry filed a motion to suppress statements obtained by the government during multiple interviews of Mr. Perry in December 2003 and January 2004 while Mr. Perry was an inmate at the Utah State Prison.  The interviews stemmed from the presence of a gun in the inmate work facility at the prison.

Specifically, Mr. Perry contends that (1) the government violated his rights under Miranda v. Arizona, 384 U.S. 436 (1966), when it interrogated him without giving a Miranda warning; (2) the government violated his rights when it continued interrogation of Mr. Perry after he requested an attorney; (3) the government coerced Mr. Perry's statements by interrogating him when he was under duress from harsh conditions deliberately created by prison officers; and (4) otherwise admissible statements made by Mr. Perry after his rights were violated should be suppressed as well due to bad faith conduct of prison officials.  The United States contends that

Mr. Perry, who testified during the evidentiary hearing, is not credible; that the government

witnesses' testimony belies Mr. Perry's allegations; and that there is no evidence of bad faith on

the part of the government.

The court finds that Mr. Perry's right to counsel was violated on December 8, 2003.

Accordingly, the statements he made during the law enforcement initiated interview of December

8, 2003, must be suppressed.  But because Mr. Perry initiated the January 12, 2004 interview,

during which he validly waived his Miranda rights, the statements he made during that session

should not be suppressed.  Accordingly, Defendant Clifford Perry's Motion to Suppress is

GRANTED IN PART and DENIED IN PART.

## FINDINGS OF FACT[1]

Altogether, five interview or interrogation sessions occurred between Mr. Perry and

investigating officers.  They occurred on (1) the morning of December 5, 2003; (2) the afternoon

of December 5, 2003; (3) December 8, 2003; (4) December 12, 2003; and (5) January 12, 2004.

These five sessions were all related to the report and recovery of a gun hidden in the prison, and

the investigation that followed.

Mr. Perry does not seek to suppress any statements made during the morning of

December 5, 2003.  And the government does not intend to present any statements made on the

---

[1]Unless otherwise noted, the facts are taken from the testimony presented during the June 2, 2006 evidentiary hearing on Mr. Perry's Motion to Suppress (see Transcript of June 2, 2006 Evidentiary Hearing on Defendant's Motion to Suppress ("Tr. 1")), and the June 14, 2006 evidentiary hearing (continued from June 2, 2006) on the motion to suppress (see Transcript of June 14, 2006 Evidentiary Hearing (Continued) on Defendant's Motion to Suppress ("Tr. 2")). In addition, the Transcript of the February 24, 2005 Evidentiary Hearing on Defendant Paul Kimball's Motion to Suppress Evidence is also part of the record.

afternoon of December 5, 2003, because it concedes that the interview was a custodial interrogation and no <u>Miranda</u> warning was given during that session.  The government also does not intend to present any statements made by Mr. Perry on December 12, 2003.  That leaves the statements made during the December 8th and January 12th sessions.  But the events occurring during the other interview sessions are still relevant to the issues before the court, so they will be discussed as well.

**Events Leading Up to the December 5, 2003 Morning Session**

On December 4, 2003, Bryant Green, a supervisor in the Utah State Prison's law enforcement bureau over investigations, received a call from Kevin Pepper, an investigator with the Utah Department of Corrections.  Investigator Pepper said he had received a call from a confidential informant in the prison about a serious, but unspecified, problem in the prison. The informant said that "he had something really big, something really important that he needed to talk to [Investigator Pepper] about."  (Tr. 1 at 53.)  But the confidential informant did not go into detail.  Instead, he wanted to meet with Investigator Pepper in person to discuss the problem. Investigator Pepper, who received the call at home after work, told the informant that he would meet with the informant the next day.

Later that same evening, Captain Green received a call from a shift commander about a tip from an inmate (identified only as "Trujillo" in the record) about the presence of a firearm inside the prison.  Captain Green arranged for an investigation to begin the next day at 8:00 a.m.

On the morning of Friday, December 5, 2003, Captain Green met with Investigator Pepper, Investigator Leo Jonathan "John" Perry (a Utah Department of Corrections investigator assigned to the prison), and other officers.  Then Captain Green, Investigator Pepper, and

Investigator Perry arranged to meet with Investigator Pepper's confidential informant, Paul Kimball (a co-defendant in this case), that morning.

**December 5, 2003 Morning Session**

Because Mr. Kimball was being held in a less restrictive block of the prison (C Block), he was allowed to walk unescorted to the interview in the prison's Wasatch facility administration corridor. When Mr. Kimball arrived at the interview room, he was accompanied by Mr. Perry (who was also housed in C Block). Mr. Perry testified that he also requested an interview that morning, but through a different prison official. Mr. Kimball and Mr. Perry were not handcuffed and came to the meeting voluntarily. Mr. Kimball and Mr. Perry met with Investigator Pepper and Captain Green, and Mr. Kimball informed the two investigators that he and Mr. Perry had discovered a gun hidden in the Utah Correctional Industries (U.C.I.) facility (where inmates work during the day). No Miranda warnings were given, and neither Mr. Kimball nor Mr. Perry were suspects in any crime at that point.

Upon learning about the gun from Mr. Kimball (whom prison officials considered to be a reliable informant), the investigators' primary concern became recovering the gun and protecting the safety of informants Kimball and Perry. After Mr. Kimball told them where the gun was hidden, the investigators sent Mr. Kimball and Mr. Perry back to their cells in C Block, the prison went into "lockdown" (that is, all inmates were locked in their cells) at about 10:45 a.m., and the gun was recovered.

**December 5, 2003 Afternoon Session**

Prison investigators began interviewing many different inmates about the gun.[2]  As part of that process, in the early afternoon of December 5, 2003, Investigator Perry initiated another meeting with Mr. Perry, again held in an office in the administration corridor.  Although Investigator Pepper was present, he was not the lead investigator (that day was his last day of employment with the Utah Department of Corrections).  Captain Green stopped in for a short time during the afternoon session with Mr. Perry.

Before Investigator Perry met with Mr. Perry, he met with inmate Paul Trimble. According to Investigator Perry, "we received more information from inmate Trimble that inmate Kimball had been involved in orchestrating bringing the gun into the prison."  (Tr. 2 at 6.)  When Investigator Perry was asked whether Mr. Trimble mentioned anything about Mr. Perry's involvement with the gun, the investigator answered:

> It seems that [Mr. Trimble] mentioned inmate Kimball and [inmate] Perry being together when the meal carts were shipped over to the U.C.I. facility, but inmate Trimble at that point didn't discuss inmate Perry's involvement in bringing the gun into the prison. . . . [The] information [from Mr. Trimble] made us suspect inmate Kimball's story as to his personal involvement in the gun coming into the prison in the first place.  Based on that, [the purpose of] our interviews with [inmates] Jeff Roberts and Clifford Perry [on the afternoon of December 5th] was to try and determine or try and support inmate Trimble's side or trying to fill in the gaps between inmate Kimball's story and inmate Trimble's story.

(Tr. 2 at 6, 8.)  But Investigator Perry testified that it was "fair to characterize [his] approach to Mr. Perry that afternoon as starting to get a little fishy about [Mr. Perry]," and he admitted that he

_____

[2]Investigator Perry estimated that at least fifteen inmates were interviewed.  When asked why the large number, Investigator Perry replied: "Our concern was singling out specific inmates to make them appear as if they were an informant or they were sharing information in this case." (Tr. 2 at 5.)

had a suspicion at that point that Mr. Perry might be involved with the alleged scheme to bring

the gun into the prison.  (Id. at 8.)

Investigator Pepper testified that he did not recall one way or the other whether a Miranda

warning was given to Mr. Perry during the afternoon session.  Investigator Perry said he did not

give Mr. Perry a Miranda warning at that point, but his testimony suggests that he assumed that

Investigator Pepper, who had interviewed Mr. Perry earlier, had given the Miranda warning

already.  His testimony also suggests that he did not consider Mr. Perry a suspect at that time.

> Q    When you started the interview before talking to Mr. Perry, did you give
>      him his Miranda rights?
>
> A    Not during that interview.
>
> Q    Why not?
>
> A    A couple of reasons. . . . The first thing was that was the last day that
>      Investigator Pepper was working at the prison.  He originally had received
>      the information of the gun coming in – or the weapon being in the facility.
>      He had originally talked with inmate Kimball and inmate Perry.
>
>      I relied pretty heavily on Investigator Pepper at that point as the primary in
>      that interview.  Towards the end of the day it became more apparent to me
>      that Investigator Pepper was cutting his ties with the case and that the
>      investigation would be mine.
>
>      And so the second answer to that question is inmate Perry, like inmate
>      Trimble, the focus of our investigation with them was that we felt like we
>      didn't have anything hard – any hard fact that they were involved in
>      bringing the gun in at that point.  At least from my perspective it was our
>      intention to get [corroborating] evidence or information as to inmate
>      Kimball bringing the gun in.

(Tr. 2 at 11.)

The session was confrontational and voices were raised.  The investigators described Mr.

Perry as uncooperative (particularly in comparison to his demeanor during the morning session).

Investigator Perry testified that "the focus of the interview was becoming more poignant as to, you know, things are not adding up." (Tr. 2 at 12.) He said that

> in that interview it came to a point where [Mr. Perry] wasn't going to give anymore information. He didn't want to talk about it anymore. I don't remember exactly how he articulated that, but I remember that we were basically getting to the point where he was digging in his heels and we weren't making any progress. . . . [W]ithin that 15 minute time frame we terminated the interview. . . . It seems to me that Captain Green had come in, we had consulted with him, we kind of explained the situation, and it terminated after that.

(Id. at 13-14.)

Mr. Perry unequivocally testified that he requested an attorney during the questioning, that his request was not honored, and that the questioning continued despite his request.

> Q      At . . . that second December 5th interview, were you given Miranda when you got there?
>
> A      No, I wasn't.
>
> Q      Were you given Miranda at anytime during that second interview on December 5th?
>
> A      I think that when Pepper turned on the interview, he was doing that, was reading me Miranda. But when I asked him if I was a suspect and he said that until they cleared me I was, I told him, "Well, I want a [sic] attorney at this time." I think that he was reading me Miranda and I cut him off, or something to that effect.
>
> Q      So you think he started to and you cut him off?
>
> A      Yeah. And that's when I asked him if I was a suspect. And at that time I got a little aggressive with my behavior and my vocabulary.
>
> Q      So you asked if you were a suspect. He indicated that until he cleared you, you were; correct?
>
> A      Yes.
>
> Q      And you asked for counsel at that time?

A       Yes, I did.

Q       Did they make arrangements for an attorney to be present for you?

A       No, they didn't.

        . . . .

A       I told [Investigator Pepper] . . . if they had suspected me of being involved
        in anything concerning that gun, then I wanted an attorney. That I had
        nothing further to say to them.

Q       Was the interview terminated at that point?

A       No, it wasn't. It went on for some time after that.

Q       Did you get an attorney from that point on in the interview?

A       No, I didn't.

(Tr. 2 at 53-55.)

Investigator Pepper did not recall whether Mr. Perry requested an attorney during the

afternoon session.[3] Investigator Perry testified that he did not recall Mr. Perry asking for counsel

during the afternoon questioning:

Q       What about inmate Perry telling you during that [afternoon] interview on
        the 5th [of December] that he didn't want to talk about it and he wanted an
        attorney? Do you recall that happening?

A       I don't.

Q       You never recall him asking for counsel?

A       No. In fact, I feel very sensitive as far as the Miranda rights, and was – I
        felt like it was important to document that he had received his Miranda
        rights when I was conducting the interview – interviews, and so that is

_____

[3]The subject did not come up during Captain Green's testimony.

why I had him sign subsequent <u>Miranda</u> warning forms.

(Tr. 2 at 32.)  Later during the evidentiary hearing, the court pressed Investigator Perry for

clarification about whether Mr. Perry requested an attorney during the December 5, 2003

afternoon interview.

| | |
|---|---|
| THE COURT: | Did [Mr. Perry] ask for an attorney? |
| THE WITNESS: | I don't recall him asking for an attorney. |
| THE COURT: | When you say that, what do you mean, that he could have and you don't remember it or he did not? |
| THE WITNESS: | I don't believe that he asked for an attorney. |
| THE COURT: | When you say you don't believe, could he have? |
| THE WITNESS: | I don't believe nor recall him asking for an attorney.  I think if he had, I would have taken significant note to that. |
| THE COURT: | But you do not – as you sit – and I don't meant to quarrel with you.  Can you say unequivocally that he did not or are you unable to say that? |
| THE WITNESS: | During the course of that conversation, I do not remember him asking for an attorney. |

(Tr. 2 at 92.)  After the colloquy between the court and Investigator Perry, the government asked

Investigator Perry follow-up questions:

| | |
|---|---|
| Q | During [your six-year experience as an investigator], how many interviews have you conducted? |
| A | Hundreds. |
| Q | . . . During those hundreds of interviews, when – have there been people that have requested an attorney while you've been interviewing them? |
| A | Yes. |

Q        What have you done in all of those cases?

A        At that point I terminate the interview.

Q        In this circumstance, if Mr. Perry had asked for an attorney, what would
         you have done?

A        I would have terminated the interview.

         . . . .

Q        At any point did you terminate this interview with Mr. Perry on December
         5th in the afternoon?

A        Eventually yes, we terminated the interview.

Q        Was that because Mr. Perry requested an attorney?

A        No.

(Id. at 93-94.)  Again, the court asked Investigator Perry for clarification.

THE COURT:          But you do – but I guess I'm confused, officer.  Can you
                    say he did not ask for an attorney?

THE WITNESS:        Again, the same response.  I do not remember him asking
                    for an attorney.

(Id. at 94.)  For the reasons set forth below in the "Conclusions of Law" section, the court finds

that Mr. Perry did request an attorney but did not receive one.  Moreover, the interrogation

continued despite his request.

        After the interview, prison officials moved Mr. Perry from C Block to the Uinta 1

Facility, the maximum security area of the prison.  They did this for safety and security reasons.

(See Tr. 1 at 44-45).

**December 8, 2003 Session**

On December 8, 2003, Investigator Perry initiated another interview with Mr. Perry.  This

time the interview took place in the contact visiting booth in the Uinta 1 facility.  No one else

was present.  Investigator Perry read Mr. Perry his Miranda rights, and Mr. Perry signed a waiver

of those rights.  Mr. Perry contends that he was coerced into signing the waiver because of the

conditions he experienced in the Uinta 1 facility a day or two before the interview.[4]  The

interview lasted approximately two hours.

**December 12, 2003 Session**

Captain Green initiated the December 12, 2003 interview session with Mr. Perry.

Another officer accompanied Captain Green.  No other individuals were present.  No Miranda

warning was given.  Mr. Perry referred to the interview as "informal" (Tr. 2 at 67) and testified

that "it was more telling me about Kimball and asking questions about Kimball."  (Id. at 74.)

**January 12, 2004 Session**

Mr. Perry initiated this interview session based on letters he had received from Mr.

Kimball.  He met with Investigator Perry, who gave Mr. Perry a Miranda warning.  An attorney

was not present.  Mr. Perry signed a waiver of his Miranda rights, agreed to talk, and did not

request an attorney.

## CONCLUSIONS OF LAW

As noted above, Mr. Perry does not seek to suppress any statements made during the

---

[4]Because the court bases its ruling on Mr. Perry's right to an attorney, the court need not
elaborate on Mr. Perry's allegations of harsh conditions in Uinta 1 between December 5, 2003,
and December 8, 2003.

December 5, 2003 morning session.  The government does not intend to present any statements made during the December 5, 2003 afternoon session, or the December 12, 2003 session.  The court must determine whether to suppress the statements Mr. Perry made on December 8, 2003, and January 12, 2004.  For the reasons set forth below, the court concludes that Mr. Perry's statements on December 8, 2003, were obtained in violation of his right to counsel and so must be suppressed.  But his statements on January 12, 2004, an interview that Mr. Perry initiated, were lawfully obtained and so will not be suppressed.

**December 8, 2003 Statements**

The admissibility of the December 8, 2003 statements depends on whether Mr. Perry requested an attorney during the December 5, 2003 afternoon interrogation.  This is so because if Mr. Perry requested an attorney, then all statements obtained during subsequent interviews initiated by law enforcement (including the December 8, 2003 interview) are inadmissible. "Interrogation of an accused must cease once the accused invokes the right to counsel."  Clayton v. Gibson, 199 F.3d 1162, 1172 (10th Cir. 1999) (citing Miranda v. Arizona, 384 U.S. 436, 474 (1966)); see also Moran v. Burbine, 475 U.S. 412, 423 n.1 (1986) ("When a suspect *has* requested counsel, the interrogation must cease, regardless of any question of waiver, unless the suspect himself initiates the conversation.") (emphasis in original); United States v. Alexander, 447 F.3d 1290, 1294 (10th Cir. 2006) ("If an individual expresses his desire to remain silent, all interrogation must cease.") (citing Michigan v. Mosley, 423 U.S. 96, 100 (1975)).  "Nonetheless, an accused may be interrogated further if, after invoking the right to counsel, he voluntarily initiates further communication with the police and waives his right to counsel."  Clayton, 199 F.3d at 1172 (citing Edwards v. Arizona, 451 U.S. 477, 484-85 (1981)); see also Alexander, 447

12

F.3d at 1294 ("[A] defendant–even if he has asserted the right to counsel–may choose to reinitiate contact with the police so long as the government does not coerce him into doing so.") (citing Edwards, 451 U.S. at 484-85).

The December 5, 2003 afternoon interview was a custodial interrogation, as the United States concedes. (See U.S.'s Opp'n Mem. at 16.) And no Miranda warning was given.

The controlling issue is whether Mr. Perry requested an attorney during the interview. Certainly resolution of this factual issue centers around Mr. Perry's credibility (in particular, his demeanor on the stand and the content of his testimony), but it also requires a review of the overall record. The court finds that, while it is a close question, the balance of the evidence in the record weighs in favor of Mr. Perry's position that he did request an attorney.

In the end, the United States's witnesses could not recall whether Mr. Perry requested an attorney. And although Investigator Perry said he was "very sensitive" to Miranda rights, the fact is that Mr. Perry did not receive a Miranda warning at the December 5, 2003 afternoon interview in which Investigator Perry participated.

Moreover, Mr. Perry unequivocally testified under oath that he did request an attorney. Many of the circumstances the United States points to in an effort to discredit Mr. Perry (e.g., his long-term convicted felon and prisoner status, the delays in his case, his failure as a pro se filer to raise the right-to-counsel issue in an earlier motion to suppress, his failure to raise other issues earlier in the case, and his addiction to chewing tobacco despite the prison's rule against tobacco use) are not persuasive. As for the government's evidence regarding Mr. Perry's prison grievances (or lack thereof regarding the alleged harsh prison conditions), the evidence provided by the government was inconclusive regarding whether Mr. Perry actually lied on the stand about

13

the purportedly harsh conditions and about the grievance he allegedly filed with the prison

regarding those conditions.  For instance, the government's evidence does not support the

government's position that Mr. Perry did not actually submit a grievance about the alleged

shower incident[5] to his prison guards.  The evidence does not support the government's position

that the alleged shower incident never occurred.  And there is some question about whether the

evidence of the prison grievance file is reliable.  During final argument, the government

withdrew part of its credibility argument regarding grievances because prison officials finally

found the actual grievance at issue and it did not support the proposition for which it had been

cited.  In short, there is no effective rebuttal evidence to refute Mr. Perry's testimony.

Because the court concludes that Mr. Perry did request an attorney during the December

5, 2003 afternoon interview, the investigator-initiated interview on December 8, 2003 (conducted

without counsel present) violated Mr. Perry's right to remain silent and his right to have counsel

present during questioning.  The fact that a <u>Miranda</u> warning was given on December 8, 2003

does not cure the problem.

The United States Supreme Court has held that an accused, "having expressed his desire

to deal with the police only through counsel, is not subject to further interrogation by the

authorities <u>until counsel has been made available to him, unless the accused himself initiates</u>

<u>further communication, exchanges, or conversations with the police</u>."  <u>Edwards</u>, 451 U.S. at 484-

85 (emphasis added).  "If police initiate subsequent contact without the presence of counsel, [the

---

[5]Mr. Perry alleges that at some time between December 6, 2003, and December 8, 2003, prison guards left him naked in the shower for five and a half hours while the door to the outside prison yard was left open, exposing him to the cold December air.

defendant's] statement will be <u>presumed involuntary, even where his statements would otherwise</u> <u>be deemed voluntary under traditional standards</u>." <u>Pickens v. Gibson</u>, 206 F.3d 988, 994 (10th Cir. 2000) (emphasis added). According to the bright line rule stated in <u>Edwards</u>, reading a defendant his <u>Miranda</u> rights after he has asked for an attorney does not cure the problem created when police, rather than the defendant, re-initiate contact. <u>United States v. Giles</u>, 967 F.2d 382, 386 (10th Cir. 1992); <u>United States v. Kelsey</u>, 951 F.2d 1196, 1198-99 (10th Cir. 1991) (citing <u>Arizona v. Roberson</u>, 486 U.S. 675, 686 (1988)).

Because the prison investigators initiated the December 8, 2003 interview and did not provide legal counsel for Mr. Perry during the questioning, the statements made by Mr. Perry during the December 8, 2003 interview must be suppressed.

**January 12, 2004 Statements**

But the circumstances of the January 12, 2004 interview are different. Mr. Perry initiated the interview and agreed to questioning. <u>See United States v. Glover</u>, 104 F.3d 1570, 1581 (10th Cir. 1997) (allowing law enforcement to take statement of suspect who invoked right to counsel but then re-initiated discussion). If the accused initiates further communication, the investigators may question him outside the presence of counsel if his waiver of rights was knowingly and intelligently given, and was voluntary. <u>Id.</u> Such is the case here.

Mr. Perry's waiver of <u>Miranda</u> rights was knowingly and intelligently given. Mr. Perry's <u>Miranda</u> rights were clearly explained. He signed a valid waiver of those rights. <u>See United States v. Hack</u>, 782 F.2d 862, 866 (10th Cir. 1986) ("An express written or oral statement or waiver by a defendant of his right to remain silent or of the right to legal assistance of counsel, though not conclusive, is 'usually strong proof of validity of that waiver.'") (quoting <u>North</u>

Carolina v. Butler, 441 U.S. 369, 373 (1979)).  He did not request an attorney during the January

12, 2004 interview.  And his actions and testimony demonstrate that he understands his rights

and knows how to invoke them when he desires to do so.

There is nothing in the record to show that he was coerced into signing the waiver.  Even

assuming there were harsh conditions on December 8, 2003, so much time passed (more than one

month) that the circumstances were no longer the same.  The only circumstance remaining from

December 8, 2003, was that Mr. Perry was confined in Uinta 1, a maximum security block of the

prison.  And that is not enough to show coercion.  "A defendant's confession is involuntary if the

government's conduct causes the defendant's will to be overborne and 'his capacity for self-

determination critically impaired.'"  United States v. McCullah, 76 F.3d 1087, 1101 (10th Cir.

1996) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973)).  Based on the record,

Mr. Perry was coherent and in control of his faculties during the January 12, 2004 interview.

And there is no evidence that Investigator Perry did anything that could be construed as coercive.

Mr. Perry also contends that even if the statements are otherwise admissible, they should

be suppressed based on the alleged bad faith conduct of the prison investigators.  To support his

contention, he cites to Missouri v. Seibert, 542 U.S. 600 (2004), and points to "repeated

violations of Miranda by officers trained especially in interrogating inmates," (Def.'s Reply at

10-11), the allegedly coercive conditions of confinement, the failure to record all of the

interviews, and the allegedly strategic behavior of questioning first, obtaining a confession, and

then administering Miranda warnings.  The court disagrees with Mr. Perry's contention.

This case is distinguishable from Seibert.  In Seibert, the United States Supreme Court

held that post-Miranda-warning statements obtained through the "technique of interrogating in

successive, unwarned and warned phases" were inadmissible because the interrogation technique

violated Miranda.  Seibert, 542 U.S. at 609, 617.  In that case, the police knowingly employed a

"question-first, warn-later" strategic interrogation practice.  The "warned phase of questioning

proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment."

Id. at 616.  The Court disapproved of mid-stream warnings that came during one interrogation

session, or successive interrogations "close in time and similar in content."  Id. at 613.  Justice

Kennedy, in his concurring opinion, noted that "a substantial break in time and circumstances

between the prewarning statement and the Miranda warning may suffice in most circumstances"

to cure any taint that may have lingered during the pre-warning phase.  Id. at 622.  See also

United States v. Carrizales-Toledo, 454 F.3d 1142, 1152 (10th Cir. 2006) (holding that time

lapse between the first and second interrogation – a matter of hours, if not minutes, in the same

day – along with change in interrogating officers and change in interrogation location sufficiently

broke up the two distinct questioning sessions so that no Miranda violation occurred).

      Here, the time lapse between the date of the pre-warning statements (December 12, 2003)

and the warned statements (January 12, 2004) was significant.  And the investigators were

different.  Captain Green and another officer questioned Mr. Perry on December 12, 2003,

whereas Investigator Perry was the questioning officer on January 12, 2004.  Plus, there is no

indication in the record that the investigators' failure to give Miranda warnings during some of

the interviews was anything but inadvertent (unlike the deliberate two-step interrogation at issue

in Seibert).

> It is an unwarranted extension of Miranda to hold that a simple failure to
> administer the warnings, unaccompanied by any actual coercion or other
> circumstances calculated to undermine the suspect's ability to exercise his free

will, so taints the investigatory process that a subsequent voluntary and informed
waiver is ineffective for some indeterminate period.

Oregon v. Elstad, 470 U.S. 298, 309 (1985). See also Moran v. Burbine, 475 U.S. 412, 432-34

(1986) (holding that although there might be facts where police deception would rise to the level

of a due process violation requiring suppression based on bad faith, "on these facts [the police

withheld information from suspect about attorney trying to contact him during questioning], the

challenged conduct falls short of the kind of misbehavior that so shocks the sensibilities of

civilized society as to warrant a federal intrusion into the criminal processes of the States"). The

facts of this case, in combination with the case law, does not support the remedy that Mr. Perry

seeks.

Given the totality of the circumstances, the court declines to suppress the statements

made during the January 12, 2004 interview.

**United States's Motion to Supplement Record**

On September 9, 2006, after the final argument on the Defendant's Motion to Suppress,

the United States filed a Motion to Supplement the Record with an affidavit of Sergeant Michael

Feickert or with further live testimony in supplemental proceedings. Sergeant Feickert testifies

regarding the treatment of Mr. Perry in the Uinta 1 facility.

The government had ample opportunity to present Sergeant Feickert's testimony during

the briefing of the Motion to Suppress. No good cause has been shown why the government

should now be allowed to supplement the record with Sergeant Feickert's testimony. Moreover,

the information would not necessarily change the outcome. Accordingly, the Motion to

Supplement is DENIED.

## ORDER

For the foregoing reasons, Defendant Clifford Perry's Motion to Suppress is GRANTED

IN PART AND DENIED IN PART.  The statements made by Mr. Perry on December 8, 2003,

are hereby suppressed.  The statements made by Mr. Perry on January 12, 2004, are not

suppressed.

And the United States's Motion to Supplement the Record (Dkt # 220) is DENIED.

SO ORDERED this 13th day of September, 2006.

BY THE COURT:

TENA CAMPBELL
United States District Judge